### In re TRANS WORLD AIRLINES, INC., Debtor.

**Bankruptcy No. 95–43748–399.**

United States Bankruptcy Court,
E.D. Missouri,
Eastern Division.

Aug. 4, 1995.

Ronald E. Barab, John T. Vian, Atlanta, GA, for Trans World Airlines, Inc.

*FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING MODIFIED JOINT PLAN OF REORGANIZATION*

BARRY S. SCHERMER, Bankruptcy Judge.

## INTRODUCTION

When historians look back on the twentieth century, they will no doubt regard pow-

ered flight as one of this century's most significant accomplishments. The history of aviation achievements spans the entire century; from the first controlled and sustained flights by Wilbur and Orville Wright at Kitty Hawk, North Carolina in 1903, to the end of the twentieth century where no two major cities on earth are more than 24 hours apart. Growing with the development of aircraft were the airlines which helped bring commercial flight to virtually everyone.

Trans World Airlines, Inc., ("TWA") is certainly one such airline. Its storied past is as much a part of the fabric of American aviation history as it is a part of the lives of the men and women who operate the airline. Its history chronicles the life of a swashbuckling owner, the travels of movie star passengers, and a family of dedicated employees.

Today, the recently troubled airline emerges from bankruptcy court. This case represents TWA's second Chapter 11 bankruptcy filing in 3½ years. TWA's success rests largely in the hands of its employees, the flying public and its creditors. Moreover, much of TWA's success largely depends on the accuracy of the business plan submitted by its officers. Yet, while this Chapter 11 reorganization plan looks towards statistics and events in the future, it is also important to look back on the rich tapestry of machines and people which made this airline part of aviation and, indeed, American history. For in TWA's history is a story of surviving economic troubles through unyielding employee dedication.

## I. Early History

The airline, which later became TWA, resulted from the 1930 merger between Charles Lindbergh's Transcontinental Air Transport and Western Air Express. The merger was more of a "shot gun marriage" coming from a directive by the United States Postmaster who issued all airmail routes. These early companies earned most of their income from transporting the United States

Mail and carried only those hearty passengers whose confidence in this new form of travel and strong stomach could handle the 48 hour coast to coast trip aboard the all-metal Ford Tri-Motor by day and railroad at night.[1]

It was during these early years that TWA, or T & WA as it was known at the time, first became associated with accomplished airmen. In addition to Mr. Lindbergh's early involvement, former barnstormer Jack Frye stepped up to become TWA's president at the age of 33. Mr. Frye's background as a pilot and as a former holder of a transcontinental speed record, gave him the practical skills and reputation necessary to sell the public on air travel.

Mr. Frye insisted that TWA focus on both safety and glamour in its advertisements. TWA aircraft ferried celebrities and publicity seekers. Movie stars, frequent customers of TWA, brought hordes of paparazzi and fans to airports across the country to see their heroes of the silver screen step out of TWA airplanes. The airline stressed comfort by introducing "Air Hostesses" aboard the DC-2 on December 6, 1935 and sleeper berths in 1937. Interestingly, TWA's first Air Hostesses were required to be trained nurses, thus furthering Frye's goal of making the public feel safe about flying on TWA. Some of the airline's noteworthy personnel during this period include: Ruth Rhodes Molitor as TWA's first chief air hostess; meteorologist and later supervisor Gordon "Parky" Parkinson;[2] and TWA engineer John Roche who helped develop many TWA sponsored innovations on the fabled DC-3.

## II. Howard Hughes

By 1938, Mr. Frye's need for a cash infusion for better airplanes and the unwillingness of TWA's New York investors to fund such an investment, led to the search for another source of funds. Mr. Frye found such an investor in then millionaire Howard Hughes. Mr. Hughes inherited millions

1. The air journey included as many as nine fuel stops.

2. Mr. Parkinson is perhaps best known for displaying his TWA spirit by wearing a red tie to

work every day for 35 years and later, upon his retirement, spending his Christmas savings to erect a billboard thanking the public for flying TWA.

from his father's oil industry triumphs, made movies in Hollywood, set aviation records, and founded one of the country's largest defense contractors, Hughes Aircraft, Co. Mr. Hughes not only made the $15 million investment in TWA which Frye initially sought, he later became TWA's principal stock holder. Mr. Hughes' marriage into the TWA family would shape the airline for the next two and a half decades.

As an airman and a designer, Mr. Hughes enabled TWA to set new standards and truly earn its reputation as the "airman's airline." On July 8, 1940, TWA inaugurated the Boeing 307 Stratoliner offering coast-to-coast service in 13 hours, 40 minutes. The four engine Stratoliner was pressurized allowing TWA to offer its passengers more comfort by flying its routes above rough weather. During World War II, the Stratoliner proved vital to the war effort, ferrying supplies to Europe and returning with wounded soldiers.

Mr. Hughes' next achievement came in 1944 with the development of the Lockheed Constellation or "Connie". The Connie remains one of the most cherished and innovative airplanes of all time. New features on this aircraft included hydraulically powered controls, and a thermal de-icing system for wing and tail-unit leading edges. It was powered by four 2,200 h.p. radial engines, driving three-bladed fully feathering and reversible propellers.

On April 17, 1944, Mr. Hughes and Mr. Frye introduced the Connie to the media and the world in a highly publicized record setting flight from Burbank, California to Washington, D.C. in 6 hours, 57 minutes. By 1946, TWA became truly a world-class carrier as it offered scheduled international service aboard the Constellation leaving New York bound for Gander (New Foundland), Shannon (Ireland), and finally Paris. Throughout the late forties and early fifties, Americans were treated with a series of significant TWA services aboard the Connie and its later incarnation, the Super Constellation. The Paris Sky Chief and the New York Sky Chief offered all-sleeper deluxe transatlantic service. On October 19, 1953 TWA offered

the first scheduled nonstop transcontinental air service (eastbound) aboard the Super Constellation. The trip took 8 hours. Later, TWA would present two classes of service, First Class and Sky Tourist service, in the Super G Constellation. Finally, TWA operated a polar route flight between Los Angeles and London with the 1649A Constellation.

For Howard Hughes, the Constellation may have marked the last of the good years between himself and TWA. While Mr. Hughes' association with Hollywood brought TWA unprecedented fame,[3] his reluctance to embrace jet powered aircraft caused TWA to stumble financially and eventually brought about Mr. Hughes' divorce from the TWA family. TWA had lost $4.5 million in three years using its piston powered aircraft and, as a result, Mr. Hughes was forced to put his majority TWA stock in a voting trust controlled by Wall Street lenders as security for the $165 million needed to purchase new jet aircraft. TWA finally launched jet service on March 20, 1959.

Mr. Hughes remained a stock holder until 1966, but his influence would never be the same. The Connie remained in TWA service until April 6, 1967, but its years of dominating air service were well behind it. The airman's airline became the Wall Street airline as the carrier entered the jet age.

III. *Profits, Innovation and Diversification*

TWA entered the jet age under the direction of new president Charles Tillinghast. Mr. Tillinghast was the antithesis of Mr. Hughes. Mr. Hughes was the swashbuckling airman who ruled TWA with flare, glamour, and panache. Mr. Tillinghast was not a pilot but an attorney for Bendix Corporation, whose president controlled the voting trust overseeing Mr. Hughes' shares in TWA. Unlike his predecessor, Mr. Tillinghast ruled TWA with stoic bottom-line oriented management and with all the melodrama of baking bread. Mr. Tillinghast's lack of flying experience and staid management, however,

---

3. It has been alleged that Mr. Hughes' close friendship with Cary Grant was the reason why a TWA airplane was chosen to fly behind Grant in the film *North by Northwest*.

did not prohibit him from guiding TWA through some of its most profitable years.

The first move away from the glamour of the air and into the world of big business came by way of a lawsuit against Mr. Hughes and the Hughes Tool Company. The suit alleged that Summa Corporation, the successor to Hughes Tool Co., used its dominant position as majority shareholder to make major corporate decisions for TWA causing losses of profits for TWA. Mr. Hughes not only prohibited TWA from purchasing planes and forced TWA to lease or purchase the planes directly from Hughes Tool Co., but also deliberately caused delays in the delivery of such planes to TWA in order to minimize Howard Hughes' and Hughes Tool Company's tax exposure. This interesting lawsuit eventually resulted in a $137.6 million judgment in favor of TWA and against Hughes Tool Co. on December 23, 1969.[4]

Away from the courtroom, Mr. Tillinghast converted TWA into a consistent money maker. From 1963 through 1969, Mr. Tillinghast, with the help of dedicated TWA employees such as Charles Smirl and Richard Pearson, led the airline through an unbroken string of profits. Jet service had proved popular with the public and healthier on TWA's bottom line. By 1962, annual revenues reached $1 billion.

In the age of strict government airline regulation of routes and prices, airlines competed with services and not with low fares. Despite its late entry into the jet age, TWA became the first all-jet airline in international service with cessation of piston aircraft operation on all oversees routes in October 1961. Other innovations would follow. TWA introduced in-flight movies in July, 1961 and installed Doppler radar navigation systems on transatlantic flights eliminating the need for an on-board professional navigator.

In addition to technical and service innovations, TWA also earned acclaim for its famous passengers. In 1965, TWA returned Pope Paul VI to Rome on a specially configured Boeing 707 after the pontiff's historic visit to New York. Then in 1979, TWA flew Pope John Paul II from Boston to LaGuardia–Philadelphia–Des Moines–Chicago O'Hare–Washington, D.C.–Rome on a personalized 727–200 on the domestic portions and a special 747 on the transatlantic flight.[5]

Another trend which defined the era of strict regulation was diversification. The Wall Street businessmen controlling TWA felt that one way the airline could avoid the feast or famine ups and downs of the airline industry was to branch out and diversify operations. TWA diversified into several nonseasonal industries to balance its profit flow. Trans World Corporation was founded as the holding company for TWA which then acquired Hilton International (hotels), Century 21 (real estate), Canteen Corporation (vending machines) and Spartan Foods (restaurants such as Hardees).

While there is some debate as to whether diversification hurt or helped TWA, there is no doubt that the airline was ill prepared for the hard times to follow.

### IV. *Financial Troubles and Corporate Raiders*

The Wall Street interests running TWA may have prepared TWA as best they could to operate profitably in the era of government regulation, but nonetheless the airline was not prepared for the rocky times of the 1970's. A flight attendant strike in 1973 and the oil crunch of the early 1970's, which quadrupled the price of jet fuel, combined to seriously hurt TWA's bottom line.

In 1978, in a move which no major airline, except United, supported, Washington removed the airlines from the benevolent control of the Civil Aeronautics Board thus setting the airline industry free from price and route regulation. The change hurt the large carriers by encouraging low-fare start up airlines such as People's Express, but did

---

4. TWA had to wait 27 years from the date of filing the suit, until this judgment was finally paid. Even then, TWA only received $49.7 million of the total judgement.

5. TWA also had its share of famous or soon to be famous employees at this time including Brenda Holsinger. In 1967 the 26 year old Ms. Holsinger would meet the man who eventually became her husband at a West Point football game. Today she is known as Mrs. Norman Schwartzkopf.

succeed in bringing low cost travel to millions of Americans. TWA, however, could no longer rely on its reputation for catering to celebrities and on the quality of its in-flight meals. The fat years were gone and the age of heightened competition arrived.

TWA was not prepared for the battle. The losses it sustained for much of the 1970's, its high operating costs, and its weak domestic route structure led to the decision of Trans World Corp., to spin TWA off from the holding company. TWA began early 1984 as a separate stand-alone entity with no financial resources available from the holding company. As a result, TWA's stock dropped and the airline soon appeared as an attractive target for corporate raiders such as Frank Lorenzo and Carl Icahn.

TWA's employees wanted to avoid the "dreaded union-buster" Lorenzo and therefore ceded significant concessions to then "white knight" Carl Icahn. Mr. Icahn became Chairman of the Board of TWA in January, 1986 and his first years of steering the airline were remarkably successful. TWA acquired Ozark Airlines and merged Ozark into TWA's operations in late 1986. Then, aided by employee concessions and a strong economy, the airline announced record profits for 1987 and 1988.

Mr. Icahn's string of successes was not to last, however. After taking the company private in 1988, Mr. Icahn began cannibalizing many of its properties to finance raids on other companies. Mr. Icahn's efforts to reduce labor costs were also met with strong resistance from TWA's unions in part because of Mr. Icahn's attitude toward TWA employees. Finally, the Gulf War Crisis in August 1990 caused TWA and the entire airline industry to suffer huge losses in international traffic and domestic feed as well as higher fuel prices.

These losses were almost too much for TWA. Quick fix solutions such as selling off profitable routes, properties, and equipment, as well as proposed mergers were not enough to keep TWA out of Bankruptcy Court. In January, 1992 TWA filed its first Chapter 11 bankruptcy petition. One year later, Mr. Icahn stepped down as Chairman relinquishing all control and interest. Once again TWA's employees played a major role in TWA's financial resurrection. Without the substantial contribution of TWA's employees, who took a 45% equity stake in the airline in exchange for concessions, TWA would not have survived. The 1992 bankruptcy was successful in achieving employee concessions necessary for survival and for trimming some of TWA's debt, but the carrier continued to lose money.

Today, TWA stands at the gate ready to depart after its second bankruptcy filing. The airline will again be helped by the Chapter 11 bankruptcy process as this Chapter 11 plan will relieve the carrier of about $500 million in debt. Many of TWA's creditors and all of TWA's employees are betting on TWA's long term survival by taking equity in exchange for debt servicing payments and wage adjustments. TWA in turn is relying on its loyal family of employees and its creditors to persevere through the rocky times ahead. Although the future of TWA is uncertain, the Court is confident that if the same dedicated family of veteran TWA employees which this Court has known throughout the years, such as Susan Parker Stewart, Juanita Brown, and Robert Zangaro continue to work for this hometown airline, the future will look a lot brighter.[6]

## PROCEDURAL HISTORY LEADING TO CONFIRMATION

This matter came on for a hearing before this Court on August 2, 1995, pursuant to section 1128(a) of the Bankruptcy Code and Bankruptcy Rule 3020(b), to consider confirmation of the Modified Joint Plan of Reorga-

---

6. The information for this Introduction came from a variety of sources and life experiences. The Court wishes to recognize the superb series of articles on TWA written by Julius Karash and Rick Montgomery in the Kansas City Star from July 2 through July 5, 1995. *Kansas City Star,* July 2–5, 1995. Furthermore, *Jane's Encyclope-*

dia of Aviation, (1989) and Paul Dempsey, *The State of the Airline, Airport & Airline Industries,* 21 Transp.L.J. 129 (1992) proved helpful. Finally, information obtained years ago at a TWA open house at St. Louis' Lambert Field clarified some of the dates used in the Introduction.

nization, dated August 2, 1995 (the "Plan" [7]) of Trans World Airlines, Inc., debtor and debtor in possession in the above-captioned case (hereinafter referred to as "TWA" or the "Debtor"), and its wholly-owned subsidiary TWA Gate Holdings, Inc. ("Gate Holdings"). The Plan constitutes the Joint Plan of Reorganization, dated May 12, 1995, of TWA and Gate Holdings, as modified by Modifications to Joint Plan of Reorganization, dated July 14, 1995, and Supplemental Modifications to Joint Plan of Reorganization, dated August 2, 1995 (the Modifications, together with the Supplemental Modifications, collectively the "Modifications").

This case is referred to as a "Prepackaged Chapter 11 Case," as it was commenced by TWA's filing on June 30, 1995 (the "Petition Date"), of its voluntary petition under chapter 11 of the Bankruptcy Code, together with the Plan (prior to the Modifications) and its Proxy Statement/Prospectus and Solicitation of Acceptances of Prepackaged Plan of Reorganization (the "Disclosure Statement"), TWA having previously solicited acceptances of the Plan from the Holders of Claims and Interests classified as impaired by the terms of the Plan.

On the Petition Date the Court entered an Order (the "Scheduling Order") setting August 2, 1995, at 10:00 a.m. St. Louis time as the date and time of a hearing (the "Disclosure Statement Hearing") pursuant to sections 1125 and 1126(b) of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018 to consider approval of the Disclosure Statement and the Debtor's procedure for soliciting votes prior to the Petition Date to accept or reject the Plan. By separate Order of this Court dated August 3, 1995 (the "Solicitation Order"), the Court approved the Disclosure Statement and the Debtor's solicitation procedures. By the Scheduling Order the Court also set down for a hearing pursuant to sections 1128 and 1129 of the Bank-

ruptcy Code the consideration of confirmation of the Plan (the "Confirmation Hearing") to commence immediately following the conclusion of the Disclosure Statement Hearing. In addition, by the Scheduling Order the Court approved the form of the Notice of hearings to consider approval of (1) the Debtor's Disclosure Statement and solicitation procedures, confirmation of the Plan and any fee applications filed pursuant to sections 503(b) and 1129(a)(4); (2) the bar date for the filing of proofs of claims; and (3) the deadline for objections to allowance of certain claims (the "Notice"), and approved the means and manner of transmitting the Notice to the Holders of Claims and Interests and other parties identified in the Scheduling Order.

Upon consideration of the Certificate of Service filed on July 11, 1995, with respect to the mailing of the Notice on July 3 and 6, 1995,[8] and Certifications of Publication in *The New York Times* and *The Wall Street Journal,* sworn to on July 17, 1995, and July 24, 1995, respectively, filed with the Court on July 27, 1995, with respect to the publication of the Notice on July 10 and July 11, 1995, in the national editions of both such newspapers, the Court finds that due notice of the Confirmation Hearing has been given in accordance with the Scheduling Order, the Bankruptcy Code and applicable Bankruptcy Rules. Upon consideration of the Plan, the evidence introduced at the Confirmation Hearing, the affidavits, declarations and memoranda filed in support of confirmation of the Plan, all objections to the Plan that were timely filed and served and any affidavits and memoranda filed in support thereof, the arguments of counsel made at the Confirmation Hearing, and the entire record of the Prepackaged Chapter 11 Case, and after due deliberation, the Court makes the following Findings of Fact and Conclusions of Law [9]:

---

7. Capitalized terms used and not otherwise defined herein shall have the meaning ascribed thereto in Article I and in Section 8.6 of the Plan.

8. According to the Certificate of Service filed on July 11, 1995, approximately 86,615 Notices were mailed on July 3, 1995, and approximately 1660 Notices were mailed on July 6, 1995. On July 12, 1995, the Court entered an Order allow-

ing for a shortened notice period for the Disclosure Statement Hearing and the Confirmation Hearing with respect to those parties to whom Notice was mailed on July 6, 1995.

9. Any and all findings of fact shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law

## I. *FINDINGS OF FACT*

### A. *JURISDICTION AND VENUE*

This Court has jurisdiction over the Debtor, the Debtor's Prepackaged Chapter 11 Case, and this proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a). This proceeding with respect to confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L) & (O). This Court has jurisdiction to enter the releases, discharges, exculpations and injunctions contained in this Confirmation Order and particularly Part II.D. *infra*.

The Debtor was, and is qualified to be, a debtor under section 109 of the Bankruptcy Code. TWA and Gate Holdings are appropriate proponents of the Plan, and TWA was eligible on the Petition Date to file the Plan pursuant to section 1121(a) of the Bankruptcy Code.

The Debtor's principal place of business for the 180 day period immediately preceding the Petition Date was, and continues to be, in St. Louis, Missouri, in the Eastern Division of the Eastern District of Missouri. Accordingly, venue in this district and division was, and continues to be, proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### B. *OBJECTIONS TO CONFIRMATION*

#### 1. *The SEC Objection*

On July 28, 1995, the Securities and Exchange Commission (the "SEC") filed its objection to confirmation of the Plan, "unless the Plan is amended to delete a provision [Section 11.6] that purports to release the liability of non-debtor third parties...." Upon the modification of the Plan in accordance with the Supplemental Modifications, the SEC withdrew its objection by the announcement of its counsel in open court at the Confirmation Hearing.

#### 2. *The City of Los Angeles, Department of Airports Objection*

This objection was withdrawn.

#### 3. *The Cooper Objections*

Between July 24, 1995, and July 28, 1995, five objections to confirmation were filed [10] in identical format. These are the objections of Sherry L. Cooper (Docket Nos. 274 and 276), Mark Taylor Pollock (Docket No. 300), Dennis E. LaPlant (Docket No. 304), Diane R. Parise (Docket No. 290) and Edward R. Parise (Docket No. 291). In addition, objections in identical format were filed after the July 28, 1995 objection deadline by Charles J. Bendorf and Larry C. Ashcraft. The foregoing objections will be referred to as the "Cooper Objections." In the Cooper Objections the objecting parties contend that the Plan is deficient because the amounts of certain fees and expenses to be paid by TWA to advisors of its three major unions are not clearly specified in the Disclosure Statement, because certain success fees payable to said advisors are "unreasonable and excessive" and "may be violative of the Railway Labor Act" and because incentive payments to be paid to certain executives of TWA are "excessive and unreasonable." At the Confirmation Hearing, Ms. Cooper and Mr. Parise, both employees of TWA, appeared and were given an opportunity to address the issues raised by the Cooper Objections. Upon considering the Cooper Objections and the arguments made by Ms. Cooper and Mr. Parise at the hearing, the Court finds that the objections are without merit for the reasons set out below.

■ As to the disclosure issue, Sections 1.1.1.(d), 4.1 and 13.5 of the Plan provide that TWA shall pay as administrative expenses *during the bankruptcy case and in the ordinary course of business after the Confirmation Date* certain fees and expenses of the advisors to the three unions [11] which partici-

---

shall constitute conclusions of law even if they are stated as findings of fact.

**10.** The initial objection filed by Sherry L. Cooper was later amended to include additional grounds for objection. The court will herein consider the Amended Objection of Ms. Cooper. None of the five objecting parties in this group raised any

additional objections at the hearing. Mr. Parise and Ms. Cooper took the opportunity to conduct cross examination of witnesses and addressed the Court as to the objections described herein.

**11.** The three unions are the Air Line Pilots Association, International ("ALPA"), the Independent Federation of Flight Attendants ("IFFA") and the

pated in negotiating the Plan. While the Disclosure Statement does not specify the date when the Debtor's obligation to make those payments will expire, the Plan provides for the making of such payments only to the extent they are entitled to priority as administrative expenses pursuant to section 503(b) of the Bankruptcy Code or otherwise are in connection with the implementation and consummation of the Plan. Accordingly, the payments provided for will cease upon implementation and consummation of the Plan. As the Effective Date pursuant to the terms of the Plan can occur no later than September 30, 1995, the Court finds that the disclosure with respect to those payments is adequate under the circumstances.

Moreover, the amounts of the payments to the union advisors are subject to the review of the Court as being reasonable. Assuming, *arguendo,* that the Court approves the full amount requested by each advisor, given the relative amounts of money involved in this case (TWA's monthly payroll is approximately $64,000,000), the question of the number of months these payments will continue is not material. Therefore, those portions of the Cooper Objections which allege that the Plan does not comply with applicable provisions of the Bankruptcy Code relating to adequate disclosure are overruled.

■ As to the Railway Labor Act issue, Sections 1.1.1(d), 4.1 and 13.5 of the Plan provide for success fees of $250,000 each to the three financial advisors retained by the respective unions in the event TWA accomplishes a financial restructuring such as that provided for in the Plan. The Railway Labor Act, 45 U.S.C. §§ 151–188, "establishes a comprehensive scheme governing labor relations of railroads and airlines." *Barthelemy v. Air Lines Pilots Association,* 897 F.2d 999, 1007 (9th Cir.1990).

The third paragraph of 45 U.S.C. § 152 states in part: "Representatives . . . shall be designated by the respective parties without interference, influence, or coercion by the other party . . . and neither party shall in any way interfere with, influence or coerce the other in its choice of representatives."

The fourth paragraph of 45 U.S.C. § 152 states in part that: "it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization. . . ."

The crux of these provisions of the Railway Labor Act is to prohibit the use of influence "to induce action by the other [party] in derogation of what the statute calls 'self-organization,'" *Texas & N.O.R. Co. v. Brotherhood of Ry, and S.S. Clerks,* 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034 (1930) and to prohibit employers "from aiding unions (*to prevent the growth of company-beholden unions*)." *Barthelemy,* 897 F.2d at 1007 (emphasis added). The record of this case, including the provisions of the Plan, clearly shows that the unions and their advisors have at all times zealously represented the interests of the organized employees of TWA during the restructuring process. The payment of the success fees to the union advisors has not and will in no way impair the independence of the unions. Therefore, those portions of the Cooper Objections which allege that the payments to union advisors violate the Railway Labor Act are overruled.

■ The Disclosure Statement states that TWA's Board of Directors has adopted a Restructuring Incentive Compensation Bonus Plan (the "Incentive Plan") for certain key executives. The Incentive Plan provides for the grant of $750,000 in cash payments upon both the successful restructuring of TWA and the payment of all pension payments deferred from January to June 1995, which cash payments the objecting parties who filed the Cooper Objections contend are "excessive and unreasonable." While the Court understands the concerns voiced by the objecting parties, the Court also recognizes that the Incentive Plan bonuses were granted by unanimous approval of TWA's

International Association of Machinists and Aerospace Workers ("IAM").

Board of Directors on the recommendation of its Compensation Committee, that both the Compensation Committee and the Board included representatives of TWA's unions at the time of the grant, and that the bonuses were granted as an incentive to key executives to achieve successfully this unique restructuring and in consideration of the extraordinary efforts of these key executives required to accomplish that objective. Accordingly, the Court finds that the incentive payments were fully negotiated and reviewed and that such payments are reasonable under the circumstances.[12] Accordingly, the Cooper Objections are overruled.

### 4. *The Kovar Letter*

On July 14, 1995, Mr. Mike M. Kovar, a Holder of Existing Preferred Stock, filed a letter with the Court "ask[ing] that the Prepackaged Plan be revised ... to assure that preferred stockholders receive, at a minimum, an amount of common stock with [an] assumed value ... of $2.50 per share...." Neither Mr. Kovar nor anyone on his behalf appeared at the Confirmation Hearing, and his objection is therefore overruled for failure to prosecute.

### 5. *The Kenner Kourier Letter*

On July 7, 1995, Kenner Kourier Service, Inc. ("Kenner"), apparently a trade creditor of the Debtor, mailed a letter to the Court expressing his reasons "for being upset with this reorganization request." No one representing Kenner appeared at the Confirmation Hearing, and its objection is therefore overruled for failure to prosecute.

### 6. *The DeGroadt Letters*

Between July 17, 1995 and July 28, 1995, seven letters were filed with the Court protesting the payment of the Incentive Plan bonuses. These are the letters of Larry DeGroadt (Docket No. 202), Michael J. McMillan (Docket No. 204), Bruce M. Bauer (Docket No. 205), Jerome Beckman (Docket No. 206), Richard W. Weber (Docket No. 228), R.C. Dillman (Docket No. 229) and Randolph Laatsch (Docket No. 285). None

of these individuals was in attendance at the Confirmation Hearing nor were any represented at the Confirmation Hearing by counsel. Therefore, their objections are overruled for failure to prosecute.

### 7. *The Willis Objection*

On July 13, 1995, Thomas L. Willis, a shareholder of TWA, sent a letter to the Court protesting the payment of the Incentive Plan bonuses and the treatment of equity securityholders under the Plan. Mr. Willis did not appear at the Confirmation Hearing nor was he represented by counsel at the hearing. Therefore, his objection is overruled for want of prosecution.

### 8. *The Interface Objection*

This objection was withdrawn.

### C. *THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE*

#### 1. *Compliance with Section 1129(a)(1) of the Bankruptcy Code*

For the reasons set forth below, the Plan complies with the applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code.

#### a. *The Plan Properly Designates Classes of Claims and Interests.*

In accordance with sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article II of the Plan classifies all Claims and Interests, other than Administrative Claims and Priority Tax Claims which are treated in Article IV of the Plan, and each Class designated by the Plan contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.

#### b. *The Plan Satisfies the Requirements of Sections 1123(a)(2), (a)(3) and (a)(4) of the Bankruptcy Code.*

In accordance with sections 1123(a)(2), 1123(a)(3) and 1123(a)(4) of the Bankruptcy Code, the Plan in Articles III and V specifies each Class that is not impaired under the Plan, specifies the treatment of each Class

---

**12.** The Findings herein are not intended to limit in any way the Court's review of all the fee applications of professionals which may be submitted in this case.

that is impaired under the Plan, and provides the same treatment for each Claim or Interest within a particular Class, unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such particular Claim or Interest.

c. *The Plan Satisfies the Requirements of Section 1123(a)(5) of the Bankruptcy Code.*

In accordance with section 1123(a)(5) of the Bankruptcy Code, Article VI and other provisions of the Plan provide adequate means for the Plan's implementation.

d. *The Plan Satisfies the Requirements of Section 1123(a)(6) of the Bankruptcy Code.*

In accordance with section 1123(a)(6) of the Bankruptcy Code, Section 6.3 of the Plan provides that, as of the Effective Date, the Debtor shall be deemed to have adopted the Restated Certificate of Incorporation. The Restated Certificate of Incorporation, in the form of Exhibit 3.1.3 to the Registration Statement, contains a provision that prohibits the issuance of nonvoting equity securities to the extent required by the provisions of the Bankruptcy Code. The Plan also provides for an appropriate distribution of voting power among the classes of securities possessing voting power, i.e., the Common Stock, the Employee Preferred Stock and the 12% Preferred Stock. Furthermore, in the case of the 12% Preferred Stock, which has a preference over the other classes of equity securities with respect to dividends, the Restated Certificate of Incorporation contains adequate provisions for the election of directors representing the holders of such 12% Preferred Stock in the event of default in the payment of such dividends.

e. *The Plan Satisfies the Requirements of Section 1123(a)(7) of the Bankruptcy Code.*

Pursuant to Sections 6.2.1 and 6.2.2 of the Plan, Reorganized TWA's initial officers and directors shall consist of the officers and directors of TWA on the day immediately preceding the Effective Date, and any vacancies shall be filled in accordance with the Restated Certificate of Incorporation and the TWA Bylaws. Accordingly, the Plan contains, in accordance with section 1123(a)(7) of the Bankruptcy Code, only provisions that are consistent with the interests of the Holders of Claims and Interests and with public policy with respect to the manner of selection of the Debtor's initial officers and directors and any successor officers and directors.

f. *The Plan Contains Other Provisions Permitted by Section 1123(b) of the Bankruptcy Code.*

As permitted by section 1123(b)(1) of the Bankruptcy Code, Articles III and V of the Plan impair or leave unimpaired, as the case may be, each Class of Claims and Interests. As permitted by section 1123(b)(2) of the Bankruptcy Code, Section 9.1 of the Plan provides that all executory contracts and unexpired leases of TWA shall be assumed as of the Effective Date, unless previously assumed or rejected or unless a motion to reject any such executory contract or unexpired lease is then pending before the Bankruptcy Court. As no executory contract or unexpired lease has previously been rejected and no such motion to reject has been filed, the Court finds that all executory contracts and unexpired leases of TWA are to be assumed pursuant to the Plan. Section 9.4 of the Plan contains provisions for the cure of any default (other than of the kind specified in section 365(b)(2) of the Bankruptcy Code) in accordance with section 365 of the Bankruptcy Code. Based on the evidence presented and considering the absence of filed objections, the Court concludes that the assumption of such executory contracts and unexpired leases by Reorganized TWA is in the best interests of the Debtor, its Estate and creditors.

As permitted by section 1123(b)(3), Section 6.7 of the Plan provides for the retention and enforcement by Reorganized TWA of all claims, rights and causes of action that TWA or the Estate may hold against any Entity, except (a) avoidance or recovery actions under sections 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code arising as a result of the commencement of the Prepackaged Chapter 11 Case, which are released pursuant to Section 6.7 of the Plan, and (b) claims against (i) any directors, officers, employees, agents, representatives, financial ad-

visors or attorneys of the Old Indenture Trustees, or any Committee or any of its members, (ii) the board of directors, officers, directors, employees, agents or representatives of TWA, Reorganized TWA, any subsidiary of TWA or Reorganized TWA, or (iii) any Subsidiary of TWA or Reorganized TWA, or (iv) any Old Indenture Trustees, or (v) any Committee or any of its members, for actions taken or omitted to be taken in connection with or arising out of the solicitation of votes on or the administration of the Plan or the property distributed under the Plan, or any other matters arising in or related to the Prepackaged Chapter 11 Case (except for (x) any liabilities which may arise under statutes or regulations administered by the Securities and Exchange Commission or from willful misconduct or gross negligence or (y) any liabilities the release of which is prohibited by the Trust Indenture Act), liability for which claims is limited pursuant to Section 11.5 of the Plan.

■ The release of avoidance and recovery actions pursuant to Section 6.7 of the Plan is not only valid, binding, enforceable, fair and equitable under the circumstances, but is consistent with the treatment of the various impaired and unimpaired Classes of Claims under the Plan. To the extent that any holder of a general unsecured claim received a transfer that might otherwise be avoidable, the recovery of any such avoidable transfer would reinstate the general unsecured claim, which is not impaired under the Plan. To the extent any holder of an impaired Claim received a transfer that might be avoidable, the release is in consideration of the achievement of a consensual plan of reorganization, the benefits of which far outweigh the burden, if any, of giving up such claims, with the associated time, effort and expense of prosecution. In any event, the uncontroverted evidence shows that no such claims are known to the Debtor.

The release of claims pursuant to the Plan is likewise valid, binding, enforceable, fair and equitable under the circumstances. Based on the evidence that each of the parties released by the Debtor made a substantial contribution to the achievement of a consensual plan of reorganization and that,

again, the Debtor has no knowledge that any such claim exists, and on the Court's conclusion that such parties are protected in part from any such liability by the provisions of section 1125(e) of the Bankruptcy Code, the Court finds that such releases are permitted by section 1123(b)(3)(A) of the Bankruptcy Code.

As permitted by section 1123(b)(5) of the Bankruptcy Code, Article V of the Plan modifies the rights of the Holders of the Secured Claims in Classes 2 (10% Note Claims), 3 (8% Note Claims) and 5 (the PBGC Notes Claim), and leaves unaffected the rights of the Holders of all other Classes of Claims.

As permitted by section 1123(b)(6) of the Bankruptcy Code, the Plan includes other appropriate provisions not inconsistent with the applicable provisions of the Bankruptcy Code, including (a) the provisions of Section 6.4 of the Plan governing distributions on account of Allowed Claims, including the timing and calculation of amounts of property to be distributed, (b) the provisions of Section 6.9 of the Plan governing the payment of the fees and expenses of the Old Indenture Trustees and Committees, (c) the provisions of Article VIII of the Plan establishing procedures for resolving Disputed Claims, including provisions entitling the Holders of any Unimpaired Claim to commence any action, or to continue any action, against TWA or Reorganized TWA, as the case may be, to resolve any Disputed Claim in any court of competent jurisdiction, without the necessity of filing proof of such claim in accordance with Bankruptcy Rule 3003, and (d) provisions releasing or limiting the liability of those parties identified in Sections 11.5, 11.6 and 13.3 of the Plan for claims described therein. *See* Part II.D, *infra.*

2. *Compliance with Section 1129(a)(2) of the Bankruptcy Code*

The principal purpose of section 1129(a)(2) of the Bankruptcy Code is to assure that the plan proponents have complied with the disclosure requirements of section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of the plan. As found by the Solicitation Order, the Court is satisfied that the Debtor and Gate Holdings,

as proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code.

### 3. Compliance with Section 1129(a)(3) of the Bankruptcy Code

■ Section 1129(a)(3) of the Bankruptcy Code conditions plan confirmation upon a determination that the plan has been proposed in good faith and not by any means forbidden by law. Upon consideration of the totality of the circumstances, including the Debtor's diligent efforts to develop the Plan, its enduring commitment to negotiate its provisions with its creditors and stockholders, and its successful effort to effect a reorganization under chapter 11 with apparently minimal disruption to its business, the Court finds that the Plan has been proposed with the legitimate and honest objective of preserving the Debtor's business while maximizing the return available to Holders of Claims and Interests. Accordingly, the Court finds that the Plan has been proposed in good faith and not by any means forbidden by law.

### 4. Compliance with Section 1129(a)(4) of the Bankruptcy Code

Section 1129(a)(4) of the Bankruptcy Code requires as follows:

> Any payment made or to be made by ... the debtor ... for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, have been approved by, or is subject to the approval of, the court as reasonable.

Section 1.1.1 of the Plan defines as an "Administrative Claim" the fees and expenses (including those of their Professional Persons) of the Old Indenture Trustees, the Committees, IAM (the machinists' union), ALPA (the pilots' union) and IFFA (the flight attendants' union), in each case to the extent application for allowance as an Administrative Claim is made and to the extent allowed by Final Order of the Bankruptcy Court, and the fees and expenses of Professional Persons employed by the Debtor in such amounts as are allowed by Final Order of the Bankruptcy Court under section 330 of the Bankruptcy Code.

Section 6.9.3 of the Plan and the provisions of the Bankruptcy Code govern requests for payment and review for reasonableness of Administrative Claims which are subject to section 1129(a)(4) of the Bankruptcy Code. Further, nothing in this Order shall (a) be construed as a modification of the payment and review process set out in the Court's Order of July 20, 1995, Authorizing Retention of Professionals Utilized by the Debtor in the Ordinary Course of Business and Professionals Rendering Services in Connection with the Debtor's Plan of Reorganization (the "Professional Fees Order") or (b) affect the rights of the Old Indenture Trustees or the Committees as Class 9 claimants, subject to the Court's Order of July 20, 1995, referred to above. Upon the foregoing, the Court finds that the requirements of section 1129(a)(4) of the Bankruptcy Code have been met.

### 5. Compliance with Section 1129(a)(5) of the Bankruptcy Code

The Debtor has disclosed in the Disclosure Statement the identity and affiliations of those individuals proposed to serve, after confirmation of the Plan, as directors and officers of Reorganized TWA and Gate Holdings, its affiliate participating in the Plan with the Debtor. The Court finds that the continuance in such office of each such individual is consistent with the interests of Holders of Claims and Interests and with public policy. Furthermore, the Debtor has adequately disclosed in the Disclosure Statement the identity of each insider of the Debtor who will be employed or retained by Reorganized TWA and the nature of the compensation for each such insider.

### 6. Compliance with Section 1129(a)(6) of the Bankruptcy Code

The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission. Therefore, there is no need to consider the issue of compliance with section 1129(a)(6) of the Bankruptcy Code.

**7.** *Compliance with Section 1129(a)(7) of the Bankruptcy Code*

Pursuant to section 1129(a)(7) of the Bankruptcy Code, with respect to each impaired Class of Claims or Interests, each Holder of a Claim or Interest of such Class must accept the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such Holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on such date. Section 1129(a)(7) is applicable to Class 2 (10% Note Claims), Class 3 (8% Note Claims), Class 5 (the PBGC Notes Claim), Class 10 (Existing Preferred Stock Interests) and Classes 11 and 12 (Common Stock Interests), i.e., the Classes of Claims and Interests impaired under the Plan.[13] As the Declaration of Kathleen A. Soled, ballot agent for Class 5, establishes, the sole holder of the PBGC Notes Claim accepted the Plan. Accordingly, the second prong of the alternative tests of section 1129(a)(7) has been satisfied with respect to Class 5.

The Debtor's liquidation analysis and the assumptions on which it was based were set forth in the Disclosure Statement. The analysis was supported by the testimony at the Confirmation Hearing of Timothy Phelan, an expert employed by SH & E, which was retained by TWA to render an opinion on the liquidation value of the collateral for the Holders of 10% Note Claims and 8% Note Claims, and of Michael J. Palumbo, Vice President and Treasurer of TWA. The liquidation analysis, together with the testimony of Messrs. Phelan and Palumbo, demonstrates a reasonable estimation of what each Holder of a 10% Note Claim, each Holder of an 8% Note Claim, each Holder of Existing Preferred Stock, and each Holder of Common Stock (whether in Class 12 or Class 13) would receive if TWA were liquidated under chapter 7 of the Bankruptcy Code. The Debtor's estimate of the value of the property to be distributed to the Holders of Claims and Interests under the Plan, as set forth in

the Disclosure Statement, was supported by the testimony at the Confirmation Hearing of John Jinishian, a Vice President of Salomon Brothers Inc., the financial advisor retained by TWA to assist it in developing the Plan.

Based on the foregoing, the Court finds that each Holder of a 10% Note Claim, each Holder of an 8% Note Claim, each Holder of Existing Preferred Stock, and each Holder of Common Stock, will receive under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if TWA were liquidated under chapter 7 of the Bankruptcy Code on such date. (This finding is strictly for purposes of section 1129(a)(7) of the Bankruptcy Code, is not a determination of the amount of the secured claims of Holders of Class 2 or Class 3 Claims, respectively, or an Old Indenture Trustee on their behalf, and shall not establish or limit the secured claim any Holder (or Old Indenture Trustee) may assert or prove for any other purpose or with respect to any plan of reorganization of TWA other than the Plan.)

Based on the foregoing, the Court finds that the requirements of section 1129(a)(7) of the Bankruptcy Code have been met with respect to each Class of impaired Claims and Interests.

**8.** *Compliance with Section 1129(a)(8) of the Bankruptcy Code*

Section 1129(a)(8) of the Bankruptcy Code requires, as a condition to confirmation, that each Class of Claims and Interests has accepted the Plan or is not impaired under the Plan. Under the Plan, Classes 2, 3, 5, 10, 11 and 12 are impaired. As demonstrated by the Declaration of Wayne Heide, dated June 29, 1995, with respect to Classes 2, 3 and 10, the Declaration of Kathleen A. Soled, dated June 29, 1995, with respect to Class 5, and the Declaration of Geraldine Zarbo, dated June 29, 1995, with respect to Classes 11 and 12, each of such impaired Classes voted to accept the Plan by the requisite majorities

---

**13.** Sections 3.2 and 5.1.7 of the Plan provide that Class 7 (11% Note Claims) is impaired only if Class 7 accepts the Plan. As the Declaration of Wayne Heide, dated June 29, 1995, establishes, Class 7 did not accept the Plan. Therefore, Class 7 is not impaired under the Plan.

set forth in the Voting Results Table appended hereto as *Appendix 1.*

Because under the Plan all remaining Classes, i.e., Classes 1, 4, 6, 7, 8 and 9 are unimpaired, the requirements of section 1129(a)(8) of the Bankruptcy Code have been met.

9.  *Compliance with Section 1129(a)(9) of the Bankruptcy Code*

Section 1129(a)(9) of the Bankruptcy Code requires that, except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the holders of claims of the kind specified in section 507(a) of the Bankruptcy Code must receive treatment under a plan as described in said section 1129(a)(9) in order for the plan to be confirmed. In fact, the Plan provides that, except to the extent that the Holder of a particular Claim has agreed to a different treatment:

a.  With respect to a Claim of a kind specified in section 507(a)(1) of the Bankruptcy Code, on, or as soon as practicable after, the Effective Date, the Holder of such Claim will receive on account of such Claim cash equal to the allowed amount of such Claim. The Plan provides further that any such Claims representing obligations incurred in the ordinary course of business or assumed by the Debtor will be paid or performed by the Debtor when due in accordance with the terms and conditions of the particular agreements governing such obligations or consistent with past practice. The Court finds that such proposed treatment by the Debtor of any such Claim is consistent with different treatment to which the Holder of such Claim shall have agreed.

b.  Because the Prepackaged Chapter 11 Case is not an involuntary case, there are no Claims of a kind specified in section 507(a)(2) of the Bankruptcy Code.

c.  With respect to Class 1 (Claims of a kind specified in sections 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), 507(a)(7) or 507(a)(9) of the Bankruptcy Code), each Holder of a Claim in such Class will receive cash on the Effective Date equal to the allowed amount of such Claim.

d.  Treatment of Claims of a kind specified in section 507(a)(8) of the Bankruptcy Code is covered in Section 4.2 of the Plan dealing with Priority Tax Claims. Although the treatment specified in such Section 4.2 grants the Debtor the option to satisfy such Claims by making deferred cash payments, the option has been effectively eliminated by TWA's announcement prior to the Confirmation Hearing and again at the Confirmation Hearing that it has declined to exercise the option to make deferred cash payments.

Accordingly, the Court finds that the requirements of section 1129(a)(9) of the Bankruptcy Code have been met.

10.  *Compliance with Section 1129(a)(10) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code requires, as a condition to confirmation of the Plan, that at least one Class of Claims that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by an insider holding a Claim in such Class. The Court finds that all three impaired Classes of Claims, i.e., Classes 2, 3 and 5, accepted the Plan. *See* Part I.8 *supra.* Although there is no evidence that the elimination of the votes of insiders, if any, holding Claims in Classes 2 or 3 would change the determination of the acceptances by such Classes of the Plan, the uncontroverted evidence establishes that the sole Holder of the Class 5 Claim (the PBGC Notes Claim), which has accepted the Plan, is not an insider of TWA. Therefore, the requirement of section 1129(a)(10) has been met.

11.  *Compliance with Section 1129(a)(11) of the Bankruptcy Code*

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation, that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan. This test is known as the "feasibility test" and requires that the Debtor establish that the Plan has a reasonable probability of success.

TWA, with the assistance of its financial advisors, Salomon Brothers Inc., prepared a business plan for the operation of its business after the Effective Date, which is described in reasonable detail in the Disclosure Statement. Mr. Peiser, TWA's chief financial officer, and Mr. Jinishian, a Vice President of Salomon Brothers Inc., testified as to the reasonableness of the major assumptions on which the business plan is based. In addition, the Debtor's projections for the three-year period ending December 31, 1997, indicate that (i) it will have sufficient cash available to enable it to make all payments required to be made on the Effective Date, (ii) it will be in compliance with and be able to satisfy all the requirements under, *inter alia*, the new 12% Notes, the Contingent Payment Rights, the new 12% Preferred Stock, the Capital Notes (as defined in the Gate Holdings Pledge Agreement) and the New PBGC Notes to be issued under the Plan, and (iii) it will be able to meet all of the other payment obligations required by the Plan. Messrs. Peiser and Jinishian similarly testified as to the assumptions on which TWA's projections are based.

The Court finds that TWA's current forecasts are conservative and are driven by costs, which are generally subject to greater management control than are revenues. Furthermore, the Debtor has shown that its current projections are reasonable and attainable and that even if its revenue forecasts are not achieved by a comfortable margin, the Debtor should be able to meet its financial obligations under the Plan.

In addition, the Court finds that implementation of the Plan provisions for the exchange of debt for equity and other property will result in a significantly improved capital structure: the face amount of TWA's debt will be reduced by approximately $500 million; the net worth of the Debtor will increase from an approximate negative $400 million to an approximate positive $300 million; and the Debtor's annual interest expense will be reduced by approximately $50 million. The Court also has the benefit of considering the Debtor's recent financial performance, including the results of the second quarter of 1995, which showed operating income of $54.4 million and a net income of $5.2 million, achieved by the Debtor before the reduction in interest expense that will result from the Plan.

Finally, the evidence shows that the continued operation of the Debtor by its new management team, led by its chief executive officer, Jeffrey Ericksen, will enhance the prospects for success of the Plan. Based on the Court's findings that the success of the Plan is supported by evidence of reasonable and attainable forecasts, of an improved balance sheet and reduced interest expense as the result of implementation of the Plan, and of the prospects for continued stable management of the Debtor, the Court finds that the Plan has a reasonable probability of success and is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor.

12. *Compliance with Section 1129(a)(12) of the Bankruptcy Code*

In accordance with section 1129(a)(12) of the Bankruptcy Code, the Plan provides for the payment on the Effective Date of all fees payable under 28 U.S.C. § 1930, as determined by the Court at the Confirmation Hearing, to the extent such fees have not been paid.

13. *Compliance with Section 1129(a)(13) of the Bankruptcy Code*

As required by section 1129(a)(13) of the Bankruptcy Code, the Plan provides for the continuation, after the Effective Date, of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to section 1114(e)(1)(B) or (g), at any time prior to confirmation of the Plan, for the duration of the period the Debtor has obligated itself to provide such benefits.

14. *Inapplicability of Section 1129(b) of the Bankruptcy Code*

Since all impaired Classes of Claims and Interests accepted the Plan, the "cramdown" provisions of section 1129(b) of the Bankruptcy Code are not applicable.

### 15. *Inapplicability of Section 1129(d) of the Bankruptcy Code*

Because no request has been made by a governmental unit pursuant to section 1129(d) of the Bankruptcy Code, the provisions of section 1129(d) (dealing with a plan the principal purpose of which is the avoidance of taxes or the avoidance of section 5 of the Securities Act of 1933) are not applicable.

### 16. *Compliance with Bankruptcy Rule 3016(b)*

The Plan is dated and identifies the entities submitting the Plan in accordance with Bankruptcy Rule 3016(b).

## D. THE REQUIREMENTS FOR CONFIRMATION CONTAINED IN THE PLAN

### 1. *Compliance with Section 10.1.1 of the Plan*

In accordance with Section 10.1.1 of the Plan, the Prepackaged Chapter 11 Case was commenced on June 30, 1995, which is no later than fifteen Business Days after June 27, 1995, the last day of the time period prescribed for the acceptance or rejection of the Plan.

### 2. *Compliance with Section 10.1.2 of the Plan*

Section 10.1.2 of the Plan conditions confirmation of the Plan on the allowance of the 10% Note Claims and the 8% Note Claims in the respective aggregate principal amounts set forth in the Registration Statement, together with accrued and unpaid interest thereon.

Proof of Claim No. 00002, dated July 7, 1995, evidences the 8% Note Claims and was filed by the 8% Notes Indenture Trustee in the aggregate principal amount of $350,242,678, plus accrued and unpaid interest of $11,674,755.91 thereon, plus costs, fees and expenses, including attorneys' and advisors' fees. No objections to the aggregate principal amount of and accrued and unpaid interest on the 8% Note Claims were timely filed, but the Debtor timely filed a Limited Objection to the allowance at this time of fees and expenses of the 8% Notes Indenture Trustee in an unliquidated amount as set forth in the Proof of Claim. The 8% Note Claims are, therefore, allowed in said aggregate principal amount, plus accrued and unpaid interest thereon. The 8% Notes Indenture Trustee shall be, and hereby is, entitled to seek payment of its costs, fees and expenses, including attorneys' and financial advisors' fees, from the Debtor in accordance with the terms of the 8% Notes Indenture and the Plan, but subject to any applicable provisions of the Professional Fees Order and the Bankruptcy Code. The Debtor's Limited Objection, if any, to the reasonableness of the amount of fees and expenses owing with respect to the 8% Note Claims, when liquidated, is reserved.

Proof of Claim No. 00005, dated July 7, 1995, evidences the 10% Note Claims and was filed by the 10% Notes Indenture Trustee in the aggregate principal amount of $225,318,000, plus accrued and unpaid interest ($23,029,377.26 to June 30, 1995), plus costs, fees and expenses, including attorneys' fees. No objections to the aggregate principal amount of and accrued and unpaid interest on the 10% Note Claims were timely filed except for the Limited Objection of the Debtor relating to the amount of the interest and to the allowance of fees and expenses of the 10% Notes Indenture Trustee in an unliquidated amount as set forth in the Proof of Claim. As the Limited Objection to the amount of interest stated on its face that it would be withdrawn upon the entry of a Confirmation Order, the 10% Note Claims are allowed in said aggregate principal amount, plus accrued and unpaid interest thereon (which at June 30, 1995 amounted to $23,029,377.26). The 10% Notes Indenture Trustee shall be, and hereby is, entitled to seek payment of its costs, fees and expenses, including without limitation attorneys' and financial advisors' fees, from the Debtor in accordance with the 10% Notes Indenture and the Plan, but subject to any applicable provisions of the Professional Fees Order and the Bankruptcy Code. The Debtor's Limited Objection, if any, to the reasonableness of the amount of fees and expenses owing with respect to the 10% Note Claims, when liquidated, is reserved.

Accordingly, the condition set forth in Section 10.1.2 of the Plan has been met.

3. *Compliance with Section 10.1.3 of the Plan*

In accordance with Section 10.1.3 of the Plan, the date of the entry of this Confirmation Order is no earlier than May 15, 1995, and no later than August 31, 1995.

4. *Compliance with Sections 10.1.4 and 10.1.5*

Sections 10.1.4 and 10.1.5 provide that, as a condition to confirmation of the Plan, the Confirmation Order must contain certain findings and other provisions. The Court finds that the conditions contained in said Sections 10.1.4 and 10.1.5 shall have been met by the entry of this Confirmation Order. *See* Part I.C, ¶ 11, *supra*; Order, ¶¶ 3, 10, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23 and 24, *infra*, which decretal paragraphs are incorporated herein as Findings of Fact as if fully set forth herein.

5. *Compliance with Section 10.1.6 of the Plan*

The Debtor, through its counsel, has represented to the Court that this Confirmation Order is acceptable in form and substance to the Debtor. Accordingly, the condition contained in Section 10.1.6 of the Plan has been met.

6. *Compliance with Section 10.1.7 of the Plan*

In accordance with Section 10.1.7 of the Plan, the Court finds that the lessors of aircraft under Aircraft Leases which were unexpired as of October 1, 1994, have agreed in writing that the Debtor's obligation to make rental payments in the aggregate amount of at least $65 million otherwise due under the Aircraft Leases during the fourth quarter of 1994 and the first and second quarters of 1995, has been deferred or delayed for up to six months in consideration of the issuance to such lessors of not more than 350,000 shares of Common Stock and 1,150,-000 warrants to purchase shares of Common Stock (which warrants may have a nominal exercise price and are deemed to be the functional equivalent of Common Stock), and such other inducements as were acceptable to the Debtor.

7. *Compliance with Section 10.1.8 of the Plan*

In accordance with Section 10.1.8 of the Plan, the Court finds that the Union Concession Agreements remain in full force and effect and are subject to no unfulfilled condition (including any condition creating rights to revoke in any material respect the work rule and wage concessions embodied therein), other than performance by TWA or Reorganized TWA, as the case may be, in the ordinary course of business.

8. *Compliance with Section 10.1.9 of the Plan*

Based on the testimony of Mr. Palumbo, the Court finds that pursuant to the terms of the Extension, Refinancing and Consent Agreement, dated June 14, 1995, by and between TWA and Karabu Corp., the final maturity of the Icahn Financing Facilities has been extended through and including January 8, 2001. Accordingly, the condition to confirmation that the final maturity of the Icahn Financing Facilities be extended to a date not earlier than January 8, 2000, has been met.

9. *Compliance with Section 10.1.10 of the Plan*

Section 10.1.10 of the Plan conditions confirmation of the Plan on compliance with all of the requirements of section 1129(a) of the Bankruptcy Code (except for section 1129(a)(8) in the event the Proponents seek confirmation pursuant to section 1129(b) of the Bankruptcy Code). As all of the requirements of section 1129(a) of the Bankruptcy Code have been met, *see* Part I.C, *supra*, the requirement of Section 10.1.10 of the Plan has been satisfied.

10. *Compliance with Section 10.1.11 of the Plan*

Section 10.1.11 of the Plan provides that, as a condition to confirmation of the Plan, no Material Adverse Change shall have oc-

curred. Material Adverse Change is defined by the Plan to mean the failure of TWA to achieve a Cash Level (as defined in Section 1.1.99 of the Plan) of at least $110 million. Based on the testimony of Mr. Peiser at the Confirmation Hearing, the Court finds that TWA in fact achieved a Cash Level (as so defined) of well in excess of $110 million and has, therefore, met the condition set forth in Section 10.1.11 of the Plan.

### 11. Compliance with Sections 10.1.12 and 10.1.13 of the Plan

Section 10.1.12 of the Plan provides that, as a condition to confirmation of the Plan, the Pledge and Security Agreement, dated November 3, 1993, made by the Debtor in favor of the 8% Notes Indenture Trustee on behalf of the holders of the 8% Notes, shall have been duly amended to effect the release, at such time as the Gate Holdings Pledge Agreement and the Gate Subsidiaries Agreement have been duly executed and delivered in accordance with the Plan, this Order has become a Final Order, the Effective Date has occurred and Reorganized TWA has executed and delivered a $25 million Capital Note (as defined in the Gate Holdings Pledge Agreement) to the Collateral Agent appointed pursuant to the Gate Holdings Pledge Agreement in exchange for the release of the capital stock of TWA–NY/NJ Gate Company, Inc., of the obligations, representations, warranties and covenants of TWA–NY/NJ Gate Company, Inc. and the Gate Subsidiaries under the Assumption Agreement, entered into as of November 3, 1993, by and among the Debtor, TWA–NY/NJ Gates Company, Inc., the Gate Subsidiaries and the 8% Notes Indenture Trustee, relating to the Pledge and Security Agreement.

On July 14, 1995, the Debtor filed a motion in this Court seeking approval for the continuation of its prepetition solicitation of consent from the holders of 8% Notes to an amendment to the Pledge and Security Agreement which would satisfy the condition set forth in Section 10.1.12 of the Plan (the "Amendment") and for authority to enter into the Amendment in compliance with the provisions of the Pledge and Security Agreement. In connection with the Debtor's mo-

tion, the 8% Notes Indenture Trustee filed a companion motion in this Court seeking directions and instructions to enter into the Amendment. This Court approved the forms of the notices of the motions to holders of 8% Notes and other parties in interest by Order dated July 14, 1995, and scheduled the hearing thereon for August 2, 1995, at 10:00 a.m. St. Louis time.

By separate Orders of this Court on the motions of the Debtor and the 8% Notes Indenture Trustee, this Court found that the Debtor and the 8% Notes Indenture Trustee each was authorized and empowered, in accordance with the 8% Notes Indenture, the Trust Indenture Act and other applicable law (including the Bankruptcy Code), to take any and all action necessary or appropriate to meet the condition set forth in Section 10.1.12 of the Plan. Based on the separate Orders of this Court, the representations made to the Court by counsel to the Debtor and the 8% Notes Indenture Trustee, the Court finds that the Pledge and Security Agreement has been amended in compliance with Section 10.1.12 and consistent with the terms of the separate Orders of this Court, and that the separate Orders satisfy the requirement of Section 10.1.13 of the Plan, which requires that the 8% Notes Indenture Trustee's authority and power to enter into the Amendment be determined by an Order of the Bankruptcy Court.

## II. CONCLUSIONS OF LAW

### A. EXEMPTION FROM SECURITIES LAWS

Pursuant to section 1125(e) of the Bankruptcy Code, the Debtor's transmittal of the Disclosure Statement and the Plan, its solicitation of acceptances of the Plan and its issuance and distribution of new debt and new equity (other than Equity Rights and Employee Preferred Stock) pursuant to the Plan are not and will not be governed by or subject to any otherwise applicable law, rule or regulation governing the solicitation or acceptance of a plan of reorganization or the offer, issuance, sale or purchase of securities. Accordingly, TWA, Reorganized TWA and their respective directors, officers, employees, agents and Professional Persons (acting

in such capacity), the Committees, their members, and the Old Indenture Trustees, and their respective attorneys, accountants or financial advisors are entitled to the protection of section 1125(e) of the Bankruptcy Code.

Pursuant to section 1145(a)(1) of the Bankruptcy Code, the offering, issuance and distribution of new debt and new equity (other than Equity Rights and Employee Preferred Stock) shall be exempt from section 5 of the Securities Act and any state or local law requiring registration prior to the offering, issuance, distribution or sale of securities.

Pursuant to and to the fullest extent permitted by section 1145 of the Bankruptcy Code, the offer, issuance, sale, and distribution of securities (other than Equity Rights and Employee Preferred Stock) under the Plan in respect of Claims and Interests shall be exempt from any federal, state, or local law requiring registration prior to the offer, issuance, sale, or distribution of securities; *provided, however,* that nothing contained in this Confirmation Order precludes the Debtor from complying with any such registration requirements at the Debtor's sole option and discretion. Ticket Vouchers do not constitute securities, therefore, the offer, issuance, sale and distribution of Ticket Vouchers under the Plan in respect of Claims shall be exempt from any federal, state or local law requiring registration prior to the offer, issuance, sale or distribution of securities.

### B. *EXEMPTION FROM TAXATION*

Pursuant to section 1146(c) of the Bankruptcy Code (1) the issuance, distribution, transfer or exchange of new debt and new equity; (2) the creation, modification, consolidation or recording of any mortgage, deed of trust or other security interest, the securing of additional indebtedness by such means or by other means (whether (a) in connection with the issuance and distribution of the new debt or new equity, or (b) otherwise in furtherance of, or in connection with, the Plan or the Confirmation Order); (3) the making, assignment or recording of any lease or sublease; or (4) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection

with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by or in any way related to the Plan or this Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall be, and hereby are, directed to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. At the request of TWA or Reorganized TWA, the Court may from time to time issue such other or further Orders or approve the form of a notice of entry of an order pursuant to this Part II.B as may be necessary or appropriate to carry out the intentions of this Part II.B.

### C. *COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE*

As set forth in Part I.C of this Confirmation Order, the Plan complies in all respects with the applicable requirements of section 1129 of the Bankruptcy Code.

### D. *APPROVAL OF THE RELEASES PROVIDED UNDER THE PLAN*

■ Pursuant to applicable law, including but not limited to sections 105(a) and 1123(b)(3) of the Bankruptcy Code, the limitations of liability, releases, discharges, exculpations and injunctions set forth in the Plan and implemented by this Confirmation Order shall be, and hereby are, approved as an integral part of the Plan and as fair, equitable, reasonable and in the best interests of the Debtor, the Estate and Holders of Claims and Interests. In approving the foregoing the Court considered: (a) the balance of the likelihood of success of the underlying claims or potential claims; (b) the absence of objections thereto; (c) the acceptance of the Plan by all Impaired Classes; (d) the fact that the Plan is the product of extensive

arms-length negotiations among the Debtor and its creditor constituencies; (e) in the case of substantially all claims against non-Debtor entities affected (including the Old Indenture Trustees), the Debtor has contractually indemnified the parties affected from and against such claims, including the costs and expenses of defense; and (f) in the case of claims against Old Indenture Trustees released, in consideration therefor the Old Indenture Trustees are giving up their respective Indenture Trustee Charging Liens securing such indemnification rights (except for fees and expenses not paid by the Debtor) and permitting distributions to the Holders of Old Note Claims of the property provided for by the Plan free of any holdback which could otherwise be required to provide for the claims released.

All limitations of liability, releases, discharges and exculpations of and the injunction against claims and causes of action against non-Debtor entities as set forth in the Plan, which are approved herein as an integral part of the Plan and as fair, equitable, reasonable, and in the best interests of the Debtor, the Estate and Holders of Claims and Interests, shall be, and hereby are, effective, binding and enforceable in accordance with their terms against and upon all persons and entities who may have had standing to assert such claims or causes of action, and no person or entity shall possess such standing to assert such claims or causes of action after the Effective Date. In making this determination regarding such limitations of liability for, releases and discharges of and injunction against claims and causes of action against non-Debtor entities as set forth in the Plan, the Court finds that the existence of any significant liability against non-Debtor entities is remote and that no known evidence suggests that any such liability exists.

## E. *MODIFICATIONS TO THE PLAN*

The Modifications made to the Plan by the Proponents prior to entry of this Confirmation Order comply in all respects with section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019 and all other provisions of the Bankruptcy Code, and do not adversely change the treatment of the Claim or Interest of any Holder to be received under the Plan. The Court further finds that TWA and Gate Holdings, as the proponents of the Plan, determined, in accordance with Section 13.9 of the Plan, that the Modifications do not materially adversely change the treatment of Class 2 or Class 3 Claims or change the treatment of Claims or Interests in other Classes in a manner which results in a material adverse change in the relative value of the distributions to the Holders of Class 2 or Class 3 Claims compared to the treatment of such other Claims and Interests, and that the 10% Notes Indenture Trustee and the 8% Notes Indenture Trustee each, through its counsel, agreed in writing with such determination. In light of the immaterial nature of the Modifications, no additional disclosure under section 1125 is required, and pursuant to Bankruptcy Rule 3019, all Holders of Claims and Interests that have accepted the Plan prior to the Modifications are conclusively presumed to have accepted the Plan, as amended by the Modifications.

## ORDER

Upon the foregoing Findings of Fact and Conclusions of Law, it is hereby ORDERED, ADJUDGED AND DECREED as follows:

1. The Modified Joint Plan of Reorganization of TWA and Gate Holdings, dated August 2, 1995, is CONFIRMED.

2. All objections to the Plan are hereby overruled.

3. The Plan (including the Plan Documents) and all of the provisions, terms and conditions thereof, and all transactions, documents, instruments, and agreements referred to therein, contemplated thereunder, or executed and delivered in connection therewith, are approved.

4. Except as otherwise provided in the Plan, this Confirmation Order or other order of the Court, the rights afforded under the Plan and the treatment of Claims and Interests impaired under the Plan shall be in exchange for, and in complete satisfaction, discharge, and release of, all such Claims and Interests. Except as otherwise provided in the Plan, this Confirmation Order or other

order of the Court, upon the Effective Date the Debtor shall be, and the Debtor hereby is, discharged from all Claims designated as impaired under the Plan that arose before the Confirmation Date, whether or not: (i) a proof of claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of a Claim based on such debt has accepted the Plan, *provided* that nothing in the Plan or this Confirmation Order shall discharge or release the Debtor from obligations or liabilities to be paid or performed under the Plan.

5. On the Effective Date, as permitted by section 1123(b)(2) of the Bankruptcy Code and to the extent permitted by applicable law, all executory contracts and unexpired leases of the Debtor, including month to month holdover arrangements, shall be assumed by the Debtor in accordance with the provisions of section 365 of the Bankruptcy Code. Reorganized TWA shall pay in the ordinary course of business those prepetition amounts owed under all executory contracts and unexpired leases. Alleged defaults under said executory contracts and expired leases, whether or not previously asserted, including physical condition and environmental defaults, shall not be discharged by this Order or the Plan. Any right of a party other than TWA to an executory contract or unexpired lease that otherwise might be contingent, whether liquidated or unliquidated, shall not be discharged by this Order or the Plan.

6. Until the Effective Date, the automatic stay imposed by section 362 of the Bankruptcy Code shall remain in full force and effect, except as otherwise modified by prior or subsequent order of this Court; *provided* that the automatic stay is modified to the extent necessary to permit the filing or recording of financing statements or the execution of any further documents or instruments or any other actions necessary to effectuate the transactions contemplated by the Plan or this Confirmation Order.

7. The exculpations, limitations of liability and releases set forth in sections 11.5, 11.6 and 13.3 of the Plan are fair, reasonable, valid, enforceable, and binding in accordance with the Plan.

8. Pursuant to Section 6.7 of the Plan, except as otherwise provided in the Plan, all claims, proceedings, rights, interests, and causes of action of the Debtor and its Estate shall survive the confirmation and effectiveness of the Plan. As permitted by section 1123(b)(3)(B) of the Bankruptcy Code, Section 6.7 of the Plan provides for the retention, enforcement or settlement by Reorganized TWA of all claims, proceedings, rights, interests, and causes of action of TWA and its Estate, other than those avoidance and recovery actions described in said Section 6.7 and other than claims, proceedings, rights, interests, or causes of action that have been otherwise waived, released, or discharged under or in connection with the Plan or otherwise.

9. On the Effective Date, all 8% Notes, 10% Notes, the PBGC Notes and all equity securities issued by TWA or with respect to which TWA may be liable prior to the Confirmation Date shall be deemed to be canceled, terminated, void, and of no further force and effect, and shall represent only the right to receive distributions (including Conditional Consideration) under the Plan in accordance with Article V and Section 6.4 of the Plan.

10. Pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, except as otherwise provided in the Plan, on the Effective Date, all property of the Debtor and its Estate shall be revested in Reorganized TWA free and clear of any and all Liens, Claims, Encumbrances or restrictions, and Reorganized TWA shall assume the business of the Debtor and its Estate in accordance with Section 6.6 of the Plan. In addition, except as otherwise provided in the Plan, all of the property distributed under the Plan shall vest in the recipients thereof, free and clear of all claims, Encumbrances and interests of any nature whatsoever.

11. Pursuant to section 1142(a) of the Bankruptcy Code, notwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition, Reorganized TWA shall carry out the Plan and shall comply with any Order of this Court.

12. Pursuant to section 1142(b) of the Bankruptcy Code, the Court approves, and Reorganized TWA is authorized and directed to execute, deliver, and implement, the Plan Documents and any other documents, instruments, or agreements, and any amendments or modifications thereto (including, without limitation, an amendment to the charter and by-laws of TWA–LAX Gate Company, Inc. and any and all other appropriate documents as necessary to effect the transfer of the collateral pledged pursuant to the Old Security Documents relating to the 10% Notes Indenture and the 10% Notes to the 12% Notes Indenture Trustee), that may be necessary or appropriate for the implementation or consummation of the Plan.

13. Notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, the Court shall retain such jurisdiction over this Prepackaged Chapter 11 Case as is legally permissible, including (a) jurisdiction to the full extent provided for in Article XII of the Plan; (b) jurisdiction to hear requests by a Disbursing Agent with respect to any issues concerning distributions to the Holders of Claims or Interests impaired under the Plan; (c) jurisdiction to enter any order concerning distributions to or from the 12% Note Pool Trust or the 12% Preferred Share Trust; and (d) jurisdiction to enter any order concerning the rights and duties of the Old Indenture Trustees.

14. Consummation of the Plan (including the issuance of the Plan Securities and the pledge or collateral assignment of all collateral and assignment or transfer of all property provided for therein or pursuant thereto) shall not result in a transfer violating any fraudulent transfer or conveyance law of the United States of America, any state, territory or possession thereof, or the District of Columbia, applicable to the Debtor, Gate Holdings or their successors or assigns, or any other avoidable transfer with respect to the Debtor or any of its Affiliates (including without limitation Gate Holdings and the Gate Subsidiaries) or any Holders of Claims. The Court finds that no transfer or obligation under the Plan was made or incurred with the actual intent to hinder, delay, or defraud any entity to which the Debtor was or became, on or after the date such transfer was made or such obligation was incurred, indebted. The Court further finds that for all transfers or obligations made or incurred under the Plan, the Debtor is receiving reasonably equivalent value in exchange for such transfer or obligation.

15. The issuance of the Plan Securities, the entering into of the 12% Notes Indenture, the entering into or assumption of the Operative Documents (as defined in the 12% Notes Indenture and including the Acquired Slot Trust Agreement restated November 3, 1993, as amended and restated as of the Effective Date, and Deeds of Conveyance, dated November 3, 1993 and May 18, 1994), and the pledge or collateral assignment of the collateral provided for by the 12% Notes Indenture, the Gate Holdings Pledge Agreement and all other indentures, instruments or agreements to be executed and delivered pursuant to the Plan have been validly authorized by all necessary corporate action of the Debtor, Reorganized TWA or Gate Holdings, as the case may be, or by applicable law.

16. Reorganized TWA shall on the Effective Date execute the 12% Notes Indenture and the Operative Documents as defined therein, and grant or confirm the grant of the security interests, transfer or confirm the transfer of the rights and properties and pledge or confirm the pledge, assignment or vesting of the interests contemplated thereby. Thereupon, the 12% Notes Indenture Trustee or the Collateral Agent or Slot Trustee, under the Operative Documents, as the case may be (a) shall have a valid, enforceable and perfected first lien on and security interest in the collateral (or in the case of the Slot Trustee, shall have had the Acquired Slots as defined in the Operative Documents conveyed to and vested in it) in each case, subject to no Liens or other Encumbrances other than Permitted Liens as defined therein; (b) shall not be required to file or record any financing statement or other notice or instrument to create or perfect such lien with any federal, state or local authority or recording office (provided that this Confirmation Order shall neither prevent nor impair the effectiveness of any such filing or recording); and (c) shall have the Acquired

Slots, as defined in and pursuant to the Amended and Restated Acquired Slot Trust Agreement (amending and restating the Acquired Slot Trust Agreement, which shall remain in effect as so amended and restated, notwithstanding the rejection or cancellation of the 10% Notes Indenture) and the Deed of Conveyance and Original Deed of Conveyance described therein vested in it, free of all Liens and other Encumbrances or rights of others except those Permitted Liens as defined therein.

17. The Lien, title or other interest in such collateral created by such indentures, instruments or other agreements shall be valid and binding on and enforceable against Reorganized TWA or Gate Holdings, as the case may be, and such collateral shall be subject to no prior, pari passu or subordinate Encumbrances or claims, except as provided for in such indentures, instruments or other agreements.

18. The Lien, title and interest in the collateral created by the Gate Holdings Pledge Agreement and all other indentures, instruments or agreements to be executed and delivered pursuant thereto shall be valid and binding on and enforceable against Reorganized TWA and Gate Holdings, and such collateral shall be subject to no prior, pari passu or subordinate Liens, security interests or claims, except as provided in the Gate Holdings Pledge Agreement, and may be transferred without violating any fraudulent transfer or conveyance law of the United States of America or any state, territory or possession thereof, or the District of Columbia, applicable to Reorganized TWA and Gate Holdings and their successors and assigns.

19. The Lien, title and interest in the collateral created by the Gate Holdings Pledge Agreement and all other indentures, instruments or agreements to be executed and delivered pursuant thereto shall be continuing Liens which preclude any possibility of intervening Liens and which are vested in the Collateral Agent (as defined in the Gate Holdings Pledge Agreement), free and clear of all Liens, Claims and other Encumbrances, other than Liens granted to said Collateral Agent, the rights of the lessors under any such collateral consisting of leased terminal airport gates and related facilities, and except as provided in the Gate Holdings Pledge Agreement.

20. If for any reason any leased terminal airport gate and related facilities constituting collateral conveyed pursuant to the Gate Holdings Pledge Agreement and all other indentures, instruments or agreements to be executed and delivered pursuant thereto shall be subleased or assigned to a third party, any and all consideration in excess of the lease payments due for such leased terminal airport gate and related facilities under the underlying lease thereof shall be irrevocably granted, conveyed and transferred in fee as collateral to the Collateral Agent by virtue of the Plan, without further Order of this Court or otherwise.

21. If for any reason any such leased terminal airport gate and related facilities or underlying lease thereof is sold, assigned, transferred, exchanged or otherwise disposed of for any reason, any and all net proceeds from such transaction shall, by virtue of the Plan, be irrevocably granted, conveyed and transferred in fee as collateral to the Collateral Agent, without further Order of this Court or otherwise.

22. The Capital Notes (as defined in the Gate Holdings Pledge Agreement), when issued by Reorganized TWA and endorsed, pledged and delivered to the Collateral Agent to secure the Gate Holdings Guarantee, shall be valid, binding and enforceable indebtedness of Reorganized TWA, not subject to contractual subordination to the claims of any other Entity, shall be subject to no prior or pari passu Liens or security interests, and shall be subject to no claims or subordinate Liens or security interests created or having arisen as of the Confirmation Date, except as provided in the Gate Holdings Pledge Agreement, and by virtue of the consideration offered and received by the Debtor and Reorganized TWA pursuant to the Plan, shall be transferred without violating any fraudulent transfer or conveyance law of the United States of America or any state, territory or possession thereof, or the District of Columbia, applicable to Reorganized TWA and its successors and assigns.

23. The creation of the Lien pursuant to the Gate Holdings Pledge Agreement on the net rents, revenues, issues, profits and proceeds of any leased terminal airport gate and related facilities constituting collateral conveyed pursuant to the Gate Holdings Pledge Agreement shall constitute a present collateral assignment of title and right to receive the net proceeds of any sale, sublease, assignment or other disposition within the meaning and for the purposes of section 552 of the Bankruptcy Code and shall constitute a security interest and right of possession and control over such net rents, revenues, issues, profits and proceeds which shall extend to such net rents, revenues, issues, profits and proceeds acquired by Reorganized TWA or its estate after the commencement of a bankruptcy case by or against Reorganized TWA.

24. The 12% Note Pool Trustee and the 12% Preferred Share Pool Trustee are authorized to serve as the trustee under the Fractional 12% Note Pool Trust Agreement and the trustee under the Fractional Share Pool Trust Agreement, respectively, to rely on information concerning the identity and size of beneficial holdings of beneficial holders received from the Holders of record of 10% Note Claims and 8% Note Claims, respectively, in performing their respective duties under the Plan and the Fractional 12% Note Pool Trust Agreement and the Fractional Share Pool Trust Agreement, respectively, and the Disbursing Agents for the 10% Note Claims and the 8% Note Claims are authorized to deliver Fractional 12% Notes and Fractional 12% Preferred Shares, respectively, to such respective trustees.

25. Gate Holdings has no liabilities of any kind or nature, including contingent and unliquidated claims, other than the liabilities evidenced by the Gate Holdings Guarantee and other operative documents related thereto to which Gate Holdings is a party and other liabilities not exceeding in the aggregate $25,000.

26. Subject to the performance by the 8% Notes Indenture Trustee and the 10% Notes Indenture Trustee, or their respective agents, of their duties and obligations under the provisions of the Plan and this Confirmation Order, if any, and under the terms of the Old Indentures, such Old Indenture Trustees and their agents shall be and hereby are relieved, discharged and released by TWA, Reorganized TWA and all other Entities from all obligations, claims, rights, demands and causes of action associated with or arising from such Old Indentures. After the Effective Date, the prosecution, whether directly, derivatively or otherwise, of any such claim, debt, right, cause of action or liability released or to be released is hereby barred and enjoined.

27. To the fullest extent permitted by section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under the Plan shall not be taxed under any law imposing a stamp tax or similar tax. This Court specifically retains jurisdiction to enforce the foregoing direction, by contempt or otherwise.

28. None of (a) the Committees (and their members) or the Old Indenture Trustees, nor any of their respective officers, directors, employees, agents, representatives, financial advisors or attorneys nor (b) TWA, Reorganized TWA, Gate Holdings, nor any of their respective boards of directors, officers, directors, employees, agents or representatives shall have or incur any liability to any Holder of a Claim or Interest for any act or omission in connection with, or arising out of, any of the statements or representations included in, or alleged omissions from, the Disclosure Statement, on account of the solicitation of acceptances or rejections of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for any (i) liabilities which may arise under statutes or regulations administered by the Securities and Exchange Commission or from willful misconduct or gross negligence and/or (ii) any liabilities the release of which is prohibited by the Trust Indenture Act, and in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

29. The distribution provisions of Section 6.4 of the Plan shall be, and hereby are,

specifically approved. As of the close of business on the Distribution Record Date, the respective transfer registers for each of the Old Note Claims in Classes 2 and 3, as maintained by the respective Old Indenture Trustees, shall be closed for the purpose of making the initial distribution provided for in said Section 6.4. The Disbursing Agents shall have no obligation to recognize the transfer of any Old Notes (except for purposes of distribution of Conditional Consideration) in such Classes occurring after the Distribution Record Date unless otherwise provided for under the Plan.

30. As a condition precedent to receiving any distribution (other than that of Equity Rights) pursuant to the Plan on account of an Allowed Claim evidenced by an instrument, security or other documentation canceled pursuant to Section 6.1.2 of the Plan, the Holder of such Allowed Claim shall tender the applicable instrument, security or other documentation evidencing such Allowed Claim to the Disbursing Agent or shall otherwise comply with the provisions of Section 6.4 of the Plan. No distribution (other than that of Equity Rights) under the Plan shall be made to or on behalf of any holder of any Allowed Claim evidenced by such Old Notes unless and until such Old Notes are surrendered to the applicable Disbursing Agent or Old Indenture Trustee pursuant to Section 6.4.4 of the Plan or the holder complies with the provisions of Section 6.4.4(e) of the Plan.

31. In connection with the Plan to the extent applicable, each Disbursing Agent and Old Indenture Trustee and the 12% Note Pool Trustee and the 12% Preferred Share Pool Trustee, respectively, shall comply with all tax withholding and reporting requirements imposed upon it by any governmental unit and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Each Disbursing Agent, Old Indenture Trustee and the 12% Note Pool Trustee and the 12% Preferred Share Pool Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding or reporting requirements. Notwithstanding any other provision of the Plan, each entity (including holders of Allowed Claims) receiving a distribution of cash or Plan Securities shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations on account of such distribution.

32. Holders of Administrative Claims based on liabilities incurred by the Debtor in the ordinary course of business shall not be required to file or serve any request for payment of such Claims, and such Claims, to the extent payment thereon is due and payable after the Effective Date, shall be assumed and paid by Reorganized TWA in the ordinary course of business.

33. Notwithstanding any prior Order of this Court, any provision of the Plan, or any other provision of this Order, the rights of the United States, its agencies and instrumentalities, are unaltered by the Plan, except and to the extent that any such Entity is or may become a Holder of an 8% Note Claim, a 10% Note Claim, a PBGC Notes Claim, Existing Preferred Stock or Common Stock (the rights of any such Entity, with such exceptions, referred to herein as "Rights"). The Plan leaves unaltered all legal, equitable, and contractual Rights of the United States, its agencies, and instrumentalities. The United States, its agencies, and instrumentalities are entitled to pursue or seek enforcement of their Rights, including but not limited to the right to seek collection of money owed, in any court or other forum of competent jurisdiction, or, to the extent permitted by nonbankruptcy laws, by non-judicial process. Confirmation of the Plan pursuant to 11 U.S.C. Section 1141(d) does not discharge any Claim of the United States, its agencies, and instrumentalities (other than an 8% Note Claim, a 10% Note Claim, or a PBGC Notes Claim, if any) or affect any other Right of the United States, its agencies, or instrumentalities.

34. Notwithstanding any prior Order of this Court, any provision of the Plan, or any other provision of this Order, the United States, its agencies, and instrumentalities may commence or continue any action or proceeding to enforce their police or regula-

tory powers and may enforce any judgment obtained in any such action or proceeding.

35. Notwithstanding any prior Order of this Court, any provision of the Plan, or any other provision of this Order, the United States, its agencies, and instrumentalities shall, pursuant to 11 U.S.C. Section 502(b)(9), have 180 days to file proof of their Claims in this bankruptcy case (although nothing contained in any prior Order of this Court, any provision of the Plan, or any other provision of this Order shall be construed to require the filing of any such proof of Claim). The Claims bar date will have no force or effect with respect to any Claims of the United States, its agencies, and instrumentalities, whether asserted in this bankruptcy case or in other proceedings.

36. Notwithstanding any prior Order of this Court, any provision of the Plan, or any other provision of this Order, this bankruptcy proceeding does not prevent the United States, its agencies, and instrumentalities from setting off, after the Effective Date and to the extent permitted by applicable non-bankruptcy laws, any amounts owed the United States from any amounts the United States owes TWA.

37. Notwithstanding any prior Order of this Court, any provision of the Plan, or any other provision of this Order, all Claims (other than an 8% Note Claim, a 10% Note Claim, or a PBGC Notes Claim) of the Equal Employment Opportunity Commission ("EEOC"), whether arising prepetition or postpetition, shall (a) be determined, resolved or adjudicated in the same manner as the underlying charges of employment discrimination (and/or subsequent litigation) would have been determined, resolved or adjudicated as if this Case had not been commenced; (b) survive the Confirmation and consummation of the Plan as if the Prepackaged Chapter 11 Case had not been commenced; and not be discharged pursuant to Bankruptcy Code section 1141(d). If the EEOC later obtains a Final Order against Reorganized TWA for any of such Claims, in a nonbankruptcy forum, Reorganized TWA shall waive its right, if any exists, to object to such Claims and agrees to treat such claims as

Allowed Claims to be paid in accordance with the Plan.

38. Notwithstanding any prior Order of this Court, any provision of the Plan, or any other provision of this Order, Allowed Priority Tax Claims under section 507(a)(8) of the Bankruptcy Code are unimpaired.

39. Notwithstanding any prior order of the Court, nothing in the Plan, including Section 13.2 of the Plan, or any other provision of this Order shall be deemed to excuse TWA from compliance with applicable laws, rules, regulations or orders of governmental authorities (which compliance shall be governed by applicable law), regardless of whether such law, rule, regulation or order shall be contested.

40. The Plan designates the IRS Deferral Obligation Claim as a Class 8 Claim, which is unimpaired under the Plan. In light of the fact that, for purposes of payment, the Plan treats the Class 8 Claim in accord with the treatment of priority tax claims, whether the IRS Deferral Obligation Claim has retained the priority status it had in TWA's first bankruptcy case is not at issue in this case. Accordingly, the United States does not waive its right to argue that, and this Confirmation Order does not adjudicate whether or not, the IRS Deferral Obligation Claim has retained its priority status, in the event TWA files another bankruptcy case or files a modification to the Plan affecting the treatment of Class 8 Claims before the Claim is paid in full.

41. The provisions of the Second Amended Plan of Reorganization, as modified, confirmed by the United States Bankruptcy Court for the District of Delaware in the Old Chapter 11 Case (the "Old Plan"), with respect to distributions to holders of allowed claims in Reserve Classes (as defined in the Old Plan), including, without limitation, the provisions of Section VI.F.2.b thereof which require additional distributions on Semiannual Additional Distribution Dates (as defined in the Old Plan), shall remain in full force and effect, *provided* that, in accordance with Section 8.6 of the Plan, the holder of each claim against TWA in the Old Chapter 11 Case entitled to such distributions, including, without limitation, the holders of unresolved

or unliquidated claims and the holders of claims allowed in the Old Chapter 11 Case now or hereafter entitled to additional distributions in accordance with the provisions of the Trust Agreement or the Old Plan, shall be entitled to receive, in lieu of the 8% Notes, Preferred Stock and/or Common Stock to which such holder would have been entitled absent confirmation of the Plan, the property delivered to the Trustee pursuant to the Plan on account of such 8% Notes, Preferred Stock and/or Common Stock, together with any interest or dividends earned thereon, but subject to any Lien or priority in payment available to the Trustee pursuant to the Trust Agreement against such property for payment of any fees, costs or disbursements incurred by the Trustee.

42. Notwithstanding anything to the contrary contained or implied in the Plan or this Confirmation Order or any other order or matter relating to the Prepackaged Chapter 11 Case, nothing contained or implied in the Plan or this Confirmation Order or any other such order or matter relating to the Prepackaged Chapter 11 Case, shall prejudice, delay or in any way adversely affect (a) any claims, rights, remedies, setoffs or defenses that have been or may be brought or asserted by Interface Group–Nevada, Inc. ("Interface") arising from or relating to Interfaces's pending claim or claims from the Old Chapter 11 Case (including, but not limited to, Interface's currently pending request in the United States District Court for the District of Delaware for a segregation of assets to secure Interface's potential claim on appeal; any motion or claim for equitable or other relief Interface may bring with respect to any alleged overdistribution or underfunding relating to the Class 8 securities in TWA's Old Chapter 11 Case; or any other motions or claims for legal or equitable relief that Interface may bring in such court or other court of competent jurisdiction); or (b) the obligation of Reorganized TWA under the Trust Agreement to promptly pay to the Trustee, out of Reorganized TWA's general funds, any of the Trustee's allowed fees, costs or disbursements (including fees and expenses of professionals), *provided* that, subject to the foregoing protections for Interface, the provisions of Section 8.6 of the Plan and the foregoing paragraph 41 hereof shall be of full force and effect with respect to the conversion of Interface's right pursuant to the Old Plan to receive 8% Notes, Preferred Stock and/or Common Stock into the right to receive the property delivered to the Trustee on account of such 8% Notes, Preferred Stock and/or Common Stock.

43. Under the Plan the term "General Unsecured Claim" includes any Unsecured Claim which arose in the Old Chapter 11 Case and was entitled in that case to priority under section 507(a)(1) of the Bankruptcy Code as an administrative expense allowed under section 503(b) of the Bankruptcy Code (an "Old Priority Claim"). General Unsecured Claims are designated in the Plan as Class 9 Claims, which are unimpaired under the Plan. In light of the fact that Allowed Class 9 Claims and current Administrative Claims are both paid in full under the Plan, whether such Old Priority Claims have retained the priority status they had in TWA's first bankruptcy case is not at issue in this case. Accordingly, no Holder of any such Old Priority Claim has waived its right to argue that, and this Confirmation Order and the Plan do not adjudicate whether or not, such Old Priority Claim has retained its priority status from the Old Chapter 11 Case, in the event TWA files another case under Title 11 of the U.S.Code, or files a modification to the Plan affecting the treatment of such Class 9 Claim before such Claim is paid in full.

44. The Debtor shall mail to all record Holders of Claims or Interests as of August 4, 1995, and to those parties on the Master Notice List, a copy of the Notice of Entry of Confirmation Order, substantially in the form annexed hereto as *Exhibit A,* in satisfaction of the Debtor's obligations pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c).

45. The substantial consummation of the Plan, within the meaning of sections 1101(2) and 1127(b) of the Bankruptcy Code, shall be, and hereby is, deemed to have occurred on the Effective Date, which, pursuant to Section 10.2.2 of the Plan, shall occur no later than September 30, 1995. Reorganized TWA shall be, and hereby is, directed to file written notice of the occurrence of the Effective

Date with the Court and to serve notice thereof, substantially in the form of *Exhibit B* hereto, by U.S. Mail to all parties in interest in this case.

46. The Debtor shall file with this Court a copy of the confirmed Plan promptly after entry of this Order.

47. Notwithstanding any otherwise applicable law, including Bankruptcy Rule 7062, this Confirmation Order shall be effective and enforceable immediately upon entry.

IT IS SO ORDERED.

## APPENDIX 1

### VOTING RESULTS TABLE

#### Class 2–10% Note Claims

##### Amount

| Amount Accepting | Amount Rejecting | Percent Accepting |
|---|---|---|
| $124,594,149 | $20,943,400 | 85.61% |

##### Number

| Number Accepting | Number Rejecting | Percent Accepting |
|---|---|---|
| 839 | 514 | 62.01% |

#### Class 3—8% Note Claims

##### Amount

| Amount Accepting | Amount Rejecting | Percent Accepting |
|---|---|---|
| $148,164,071 | $72,618,233 | 67.11% |

##### Number

| Number Accepting | Number Rejecting | Percent Accepting |
|---|---|---|
| 1,755 | 365 | 82.78% |

#### Class 5—PBGC Notes Claim

##### Amount

| Amount Accepting | Amount Rejecting | Percent Accepting |
|---|---|---|
| $343,032,000 | 0 | 100% |

##### Number

| Number Accepting | Number Rejecting | Percent Accepting |
|---|---|---|
| 1 | 0 | 100% |

### Class 10—Preferred Stock

| Number of Shares Voting to Accept | Number of Shares Voting to Reject | Percent Accepting |
|---|---|---|
| 4,621,411 | 202,843 | 95.8% |

### Class 11—Employee Common Stock

| | Number of Shares Voting to Accept | Number of Shares Voting to Reject | Percent Accepting |
|---|---|---|---|
| ALPA Trust | 2,075,366 | 0 | |
| IAM Trust | 4,464,781 | 129,895 | |
| IFFA Trust | 1,025,096 | 28,750 | |
| Other Employee Trust | 1,233,665 | 20,166 | |
| Totals: | 8,798,908 | 178,811 | 98% |

### Class 12—Common Stock

| Number of Shares Voting to Accept | Number of Shares Voting to Reject | Percent Accepting |
|---|---|---|
| 10,941,727 | 63,379 | 99% |

---

### EXHIBIT A

### UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF MISSOURI

### EASTERN DIVISION

In re

Trans World Airlines, Inc.,

Debtor.

*Employer Tax I.D. No. 43–1145889*

Chapter 11

Case No. 95–43748–399

### NOTICE OF ENTRY OF CONFIRMATION ORDER

TO: ALL HOLDERS OF CLAIMS, ALL HOLDERS OF INTERESTS AND ALL OTHER PARTIES IN INTEREST IN THE ABOVE–CAPTIONED BANKRUPTCY CASE

### CONFIRMATION OF THE PLAN

**PLEASE TAKE NOTICE** that on August —, 1995, Honorable Barry S. Schermer, United States Bankruptcy Judge for the Eastern District of Missouri, entered an Order (the "Confirmation Order"), pursuant to 11 U.S.C. § 1129, confirming the Modified Joint Plan of Reorganization, dated August 2, 1995, of Trans World Airlines, Inc. ("TWA" or the "Debtor") and its wholly-owned subsidiary TWA Gate Holdings, Inc. ("Gate Holdings"), constituting the Joint Plan of Reorganization, dated May 12, 1995, of TWA and Gate Holdings, as modified by the Modifications to Joint Plan of Reorganization, dated July 14, 1995, and the Supplemental Modifications to Joint Plan of Reorganization, dated August 2, 1995 (the "Plan").[1]

### DISCHARGES, RELEASES AND INJUNCTIONS

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise provided in the Plan or the Confirmation Order, the rights afforded under the Plan and the treatment of impaired Claims and Interests under the Plan shall be in exchange for, and in complete satisfaction, discharge and release of, all such Claims and Interests. Except as otherwise provided in the Plan or the Confirmation Order, the Debtor shall be, and the Debtor hereby is, discharged from all Claims designated as impaired under the Plan that

1. Unless otherwise defined in this Notice, capitalized terms and phrases used herein have the meanings assigned to them in Article I of the Plan.

arose before the Confirmation Date, whether or not: (i) a proof of claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of a Claim based on such debt has accepted the Plan; *however*, nothing in the Plan or the Confirmation Order discharges or releases the Debtor from obligations or liabilities to be paid or performed under the Plan.

**PLEASE TAKE FURTHER NOTICE** that, as of the Effective Date, all 8% Notes, 10% Notes, the PBGC Notes and all equity securities issued by TWA or with respect to which TWA may have been liable prior to the Confirmation Date shall be deemed to be canceled, terminated, void, and of no further force and effect, and shall represent only the right to receive distributions (including Conditional Consideration) under the Plan in accordance with the Plan.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise provided in the Plan or the Confirmation Order, the Confirmation Order permanently enjoins all entities and individuals that have held, currently hold or may hold an impaired Claim or Interest that is discharged pursuant to the terms of the Plan or the Confirmation Order from taking any of the following actions on account of any such discharged Claims or Interests: (a) commencing or continuing, in any manner or in any place, any action or other proceeding against the Debtor, Reorganized TWA, their respective successors or properties other than the timely filing or prosecution of a Proof of Claim or interest or request for administrative payment in the Bankruptcy Court to share in the distributions provided for under the Plan in accordance with the Plan; (b) enforcing, attaching, collecting or recovering, in any manner or in any place, any judgment, award, decree or order against the Debtor, Reorganized TWA, their respective successors or properties; (c) creating, perfecting or enforcing any lien or encumbrance against the Debtor, Reorganized TWA, their respective successors or properties; (d) asserting a right of setoff, subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor, Reorganized TWA, their respective successors or properties; and (e) commencing or continuing any action, in any manner or in any place, that does not comply or is inconsistent with the provisions of the Plan and the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise provided in the Plan or the Confirmation Order, the Confirmation Order permanently enjoins the commencement or continuation, in any manner or in any place, of any action or other proceeding against the Committees and the Old Indenture Trustees and their respective officers, directors, agents, affiliates, accountants and attorneys from any cause of action or liability released pursuant to the Plan.

**PLEASE TAKE FURTHER NOTICE** that (a) none of the directors, officers, employees, agents, representatives, financial advisors or attorneys of the Old Indenture Trustees, or any Committee or any of its members, nor (b) the directors, officers, employees, agents or representatives of TWA, Reorganized TWA, any Subsidiary of TWA or Reorganized TWA, nor (c) any Subsidiary of TWA or Reorganized TWA, nor (d) the Old Indenture Trustees, nor (e) any Committee or its members, shall have any liability to TWA or Reorganized TWA or any Holder of a Claim or Interest for actions taken or omitted to be taken in connection with or arising out of the solicitation of votes on or the administration of the Plan or the property distributed under the Plan, or any other matters arising in or related to the Prepackaged Chapter 11 Case, except for (i) any liabilities which may arise under statutes or regulations administered by the Securities and Exchange Commission or from willful misconduct or gross negligence or (ii) any liabilities the release of which is prohibited by the Trust Indenture Act, and, in all respects, such persons shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

**PLEASE TAKE NOTICE FURTHER NOTICE** that, except as provided in the Plan or the Confirmation Order, the Old Indenture Trustees, and any of the attorneys or

financial advisors for the Old Indenture Trustees are hereby released and discharged from all known and unknown claims or causes of action of any nature on account of or relating in any way to the Claims or Interests discharged under the Plan or the negotiation, documentation and implementation of the Plan and such claims are hereby released and discharged except to the extent the release or discharge of any such claim, cause of action or liability is prohibited by the Trust Indenture Act; and after the Effective Date, the prosecution, whether directly, derivatively or otherwise, of any such claim, debt, right, cause of action or liability released or to be released is forever barred and enjoined.

**PLEASE TAKE FURTHER NOTICE** that, except as provided in the Plan or the Confirmation Order, the Committees and their respective members, only to the extent they have acted as Committees or members in connection with the negotiation, documentation or implementation of the exchange offer, restructuring or the Plan, and any of their respective attorneys or financial advisors, are hereby released and discharged from all known and unknown claims or causes of action of any nature on account of or relating in any way to the Claims or Interests discharged under the Plan or the negotiation, documentation and implementation of the Plan and such claims are hereby released except for any such claims or liabilities which may arise under statutes or regulations administered by the Securities and Exchange Commission or from willful misconduct or gross negligence; and after the Effective Date, the prosecution, whether directly, derivatively or otherwise, of any such claim, debt, right, cause of action or liability released or to be released is forever barred and enjoined.

**PLEASE TAKE FURTHER NOTICE** that the performance by the 8% Notes Indenture Trustee and the 10% Notes Indenture Trustee, or their respective agents, of their duties and obligations under the provi-

sions of the Plan and the Confirmation Order, if any, and under the terms of the Old Indentures, such Old Indenture Trustees and their agents, shall be relieved, discharged and released from all obligations, claims, rights, demands and causes of action associated with or arising from such Old Indentures; and after the Effective Date, the prosecution, whether directly, derivatively or otherwise, of any such claim, debt, right, cause of action or liability released or to be released is forever barred and enjoined.

### EXEMPTIONS FROM TAXATION

**PLEASE TAKE FURTHER NOTICE** that, to the fullest extent permitted by section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under the Plan shall not be taxed under any law imposing a stamp tax or similar tax. This Court has specifically retained jurisdiction to enforce the foregoing direction, by contempt or otherwise.

Copies of the Confirmation Order may be obtained upon request of counsel for the Debtor, Ronald E. Barab, Esq., Smith, Gambrell & Russell, Suite 3100, Promenade II, 1230 Peachtree Street, N.E., Atlanta, Georgia 30309.

Approved as to form and content this ___ day of August, 1995.

/s/ _____

Barry S. Schermer
United States Bankruptcy Judge

Order Prepared by:

SMITH, GAMBRELL & RUSSELL

_____

Ronald E. Barab
John T. Vian
Suite 3100, Promenade II
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309–3592
Telephone: (404) 815–3500
Attorneys for Trans World Airlines, Inc.

334

*EXHIBIT B*

UNITED STATES BANKRUPTCY
COURT

EASTERN DISTRICT OF MISSOURI

EASTERN DIVISION

In re

Trans World Airlines, Inc.,

Debtor.

*Employer Tax I.D. No. 43–1145889*

Chapter 11

Case No. 95–43478–399

*NOTICE REGARDING EFFECTIVE*
*DATE OF JOINT PLAN OF*
*REORGANIZATION*

TO: ALL HOLDERS OF CLAIMS, ALL
HOLDERS OF INTERESTS AND ALL
OTHER PARTIES IN INTEREST IN
THE ABOVE–CAPTIONED BANK-
RUPTCY CASE

**PLEASE TAKE NOTICE** that Trans
World Airlines, Inc. ("TWA") and its wholly-
owned subsidiary TWA Gate Holdings, Inc.
("Gate Holdings"), as the Proponents of the
Modified Joint Plan of Reorganization, dated
August 2, 1995, constituting the Joint Plan of
Reorganization, dated May 12, 1995, as modi-
fied by the Modifications to Joint Plan of
Reorganization, dated July 14, 1995, and the
Supplemental Modifications to Joint Plan of
Reorganization, dated August 2, 1995 (the
"Plan"), have determined, as represented by
TWA by way of supporting affidavit, that all
conditions to the Effective Date (as that term
is defined in the Plan) listed in Section 10.2
of the Plan have, as of August __, 1995,
either been satisfied or have been waived (if
permitted by Section 10.3 of the Plan).

**PLEASE TAKE FURTHER NOTICE**
that TWA and Gate Holdings, as the Propo-
nents, have declared August __, 1995 as the
Effective Date of the Plan.

Approved as to form and content this __
day of August, 1995.

Barry S. Schermer
United States Bankruptcy Judge

Notice Prepared by:

SMITH, GAMBRELL & RUSSELL

Ronald E. Barab
John T. Vian
Suite 3100, Promenade II
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309–3592
Telephone: (404) 815–3500
Attorneys for Trans World Airlines, Inc.